**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ERIC CHAMBERS, | ) | CASE NO. 3:22-cv-1514 (KAD) |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | October 6, 2025 |
| *Respondent*. | ) | |

**MEMORANDUM OF DECISION**
**RE: Petition for Habeas Corpus As Amended (ECF No. 1, 17)**

Kari A. Dooley, United States District Judge:

Petitioner Eric Chambers ("Petitioner" or "Chambers") was convicted after a jury trial of three counts of Aiding and Abetting a Hobbs Act robbery and one count of Aiding and Abetting an attempted Hobbs Act robbery, charges which arose from a string of robberies committed by Chambers and his co-defendant Jachim Brown, a.k.a. Ameer Edwards.  *United States v. Eric Chambers*, Dkt. No. 3:18-CR-79-KAD-2, ECF Nos. 91, 189.  Chambers was sentenced to a term of incarceration of 260 months.  Chambers brings this Petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255 seeking to vacate his conviction on the grounds that he received ineffective assistance of counsel in violation of his Sixth Amendment rights under the U.S. Constitution.  The Government has opposed the Petition.  For the reasons that follow, the Petition is DENIED.

**Procedural History and the Trial**

On April 19, 2018, the grand jury returned an indictment against Chambers and his younger half-brother, Jachim Brown (who also uses the name Ameer Edwards), which contained multiple charges related to six robberies that occurred in the fall of 2017.  On January 24, 2019, the grand jury returned the operative Second Superseding Indictment which made explicit that Chambers

was charged as an aider and abettor of the six robberies.  ECF No. 91.  Specifically, the Second

Superseding Indictment charged as follows:

- Count One: Aiding and abetting the Hobbs Act robbery of Nikita's Bar on September 27, 2017 ("Nikita's robbery");

- Count Two: Aiding and abetting the Hobbs Act robbery of Avenue Café on November 9, 2017 ("Avenue Café robbery");

- Count Four: Aiding and abetting the attempted Hobbs Act robbery of Avenue Café on November 13, 2017;

- Count Six: Aiding and abetting the attempted Hobbs Act robbery of BAR Restaurant on November 14, 2017 ("BAR robbery");

- Count Eight: Aiding and abetting the Hobbs Act robbery of EbLens on November 16, 2017 ("EbLens robbery"); and

- Count Eleven: Aiding and abetting the Hobbs Act robbery of Little Caesars Pizza on November 8, 2017.

Chambers was represented by three lawyers from the Federal Defender's Office.

Following trial, on March 19, 2019, the jury returned a verdict of guilty as to Counts One, Two,

Six, and Eight, and a verdict of not guilty as to Counts Four and Eleven.  A summary of the

evidence presented with respect to the counts of conviction is set forth below.[1]

**Nikita's Robbery**

Vincent Curcio testified that he manages four establishments in Connecticut, including

Nikita's Bar ("Nikita's") and BAR Restaurant ("BAR").  (Tr. 3/6/2019, ECF No. 212, at 50[2]).  He

hired Chambers in April 2017 to work as a security guard at Nikita's, a gentleman's club in

Bridgeport.  (*Id.* at 52, 59, 62, 71; Gov't Ex. 4).

---

[1] This summary does not attempt to include all of the evidence which might have reasonably been relied upon by the jury in rendering its verdict.

[2] All citations to trial transcripts and exhibits are to the underlying criminal case, *United States v. Eric Chambers*, Dkt. No. 3:18-CR-79-KAD-2, unless otherwise specified.

On September 27, 2017, the day of the robbery, Shemika Smith ("S. Smith"), a bartender, testified that she arrived for work at Nikita's around 10:00 a.m. and opened the bar at 11:00 a.m. (Tr. 3/6/2019 at 125). Shortly after opening, external surveillance footage shows Brown[3] walking toward Nikita's while wearing a mask, gloves, and a black sweatshirt with the hood up. (Gov't Ex. 2-B). As Brown approached the entrance, Chambers's distinctive vehicle[4] is seen driving alongside Brown before passing him. (Gov't Exs. 2-B, 2-C, 6, 7). The robbery was captured on Nikita's internal surveillance cameras. The footage largely corroborated the account of the robbery provided by S. Smith. Upon entering Nikita's, S. Smith testified that Brown demanded at gunpoint that she take him to the safe. (Tr. 3/6/2019 at 126; Gov't Exs. 2-C, 2-D). When they reached the safe room, the door was locked, and S. Smith denied having a key. (Tr. 3/6/2019 at 128). Brown accused her of lying and led her at gunpoint back to the bar where the key was located. (Tr. 3/6/2019 at 128; Gov't Ex. 2-D). After retrieving the key and entering the safe room, Brown ordered S. Smith to place the money in a bag that he brought with him, and S. Smith emptied the contents of the change safe into the bag. (Tr. 3/6/2019 at 129–30, 147; Gov't Ex. 2-E). Brown then ordered S. Smith to stay in the safe room while he departed. (Tr. 3/6/2019 at 130; Gov't Exs. 2-F, 2-G, 2-H).

Sometime after the robbery, Chambers spoke with Nicole Pariseau, a manager at BAR, about the robbery. (Tr. 3/8/2019 at 177–78). He expressed concerns that people might suspect

---

[3] Chambers did not dispute at trial that there was sufficient evidence to prove that Brown committed the underlying robberies for the counts of conviction. Such was conceded by the defense during closing arguments. For the sake of simplicity, therefore, the Court's recitation of the evidence refers to Brown as the perpetrator of all four robberies at issue.

[4] The evidence at trial established that Chambers drove a champagne-colored Nissan Maxima with a unique elongated sunroof that ran from front to back and a black sideview mirror on the driver's side. (Tr. 3/6/2019 at 191, 236–37; Tr. 3/7/2019, ECF No. 213, at 87–88; Tr. 3/8/2019, ECF No. 214, at 189; Gov't Ex. 103–113 (photographs of Chambers's vehicle); Gov't Ex. 129).

that he was involved, and Pariseau told him that he should not worry about it if he was not involved. (Tr. 3/8/2019 at 177–78).

**Avenue Café**

George Nicita testified that, on the night in question, he owned Avenue Café, a restaurant-bar, and Bishop's Corner, a strip club in Bridgeport. (Tr. 3/7/2019 at 43–44). He testified that both establishments closed at 1:00 a.m. (*Id.* at 45–46). After closing, the money from Avenue Café was placed in the safe at Bishop's Corner. (*Id.* at 51). Nicita did not know Chambers or Brown, but two of his employees, Ruben Davis and Frank Bell, were familiar with them. (*Id.* at 56, 85–87; Tr. 3/8/2019 at 48–49, 54–55).

Davis, who was responsible for transporting money from Avenue Café to Bishop's Corner at the end of the night, knew Chambers from when Chambers worked at another bar across the street from Avenue Café. (Tr. 3/7/2019 at 87). He also knew Brown, who was in a relationship with the mother of his (Davis's) child. (*Id.* at 85–86, 100, 102; *see* Gov't Ex. 26-B). Bell was the head of security at Bishop's Corner. (Tr. 3/8/2019 at 48). Bell met Chambers through Chambers's father, Hakeem, who worked at Bishop's Corner until Hakeem was fired a few months before the robbery. (*Id.* at 48–49, 51–52). Bell testified that Chambers was a regular at Bishop's Corner in 2017, even after his father's firing, and he often stayed until after closing. (*Id.* at 49–50, 52). Bell knew that Hakeem had a second son, Brown, and he recalled seeing Chambers and Brown together at another bar in 2017. (*Id.* at 54–55).

On November 9, 2017, at approximately 1:06 a.m., Davis was robbed as he arrived at Bishop's Corner to make the nightly deposit from Avenue Café. (Tr. 3/7/2019 at 93; Tr. 3/8/2019 at 53–54; *see* Gov't Ex. 25-A). External surveillance footage shows Chambers's vehicle, which had its headlights off, following Davis's vehicle as he approached the rear entrance of Bishop's

Corner. (Gov't Ex. 25-A). After pausing along the side of the road as Davis parked, the headlights on Chambers's vehicle turn on, and the vehicle drives off-camera. (*Id.*). Moments later, Brown, who is armed and wearing a mask, hooded sweatshirt, and gloves, approaches Davis from the direction Chambers's vehicle had driven. (*Id.*; Tr. 3/7/2019 at 93–94). After the robbery, Brown fled back in the direction from which he came. (Gov't Ex. 25-A). Davis testified that he remembered seeing Chambers's vehicle in the area of the back entrance of Bishop's Corner the night he was robbed. (Tr. 3/7/2019 at 103–04). It is unclear from his testimony whether he saw the vehicle before or after the robbery. The evidence properly construed supports the inference that Davis saw Chambers's vehicle after the robbery when Brown was fleeing. (*See* Gov't Ex. 25-A).

Special Agent James Wines of the Federal Bureau of Investigations ("SA Wines"), who was qualified as an expert in historical cell site analysis, testified about his analysis of Chambers's cell phone records and the cell site location data contained therein for the night of the Avenue Café robbery. (Tr. 3/14/2019, ECF No. 218, at 127). Chambers's cell phone records revealed that on the night of the robbery, he received a call at 12:29 a.m., which terminated at 12:55 a.m. (Gov't Ex. 99 at 4; Gov't Ex. 117 at 8). The phone call originated and terminated on two different cell sites, which were over two miles apart "as the crow flies." (Tr. 3/14/2019 at 142–43, 146; Gov't Ex. 99 at 4; Gov't Ex. 117 at 8). Based on the distance between the originating and terminating cell site and the length of the call, SA Wines opined that it was consistent with Chambers's cell phone moving from the south end of Bridgeport to the Boston Avenue/Mill Hill area of Bridgeport during the call. (Tr. 3/14/2019 at 145). SA Wines also testified that if someone were to place a call from Bishop's Corner, he would expect the cell phone to utilize the terminating cell site and cell sector being discussed. (*Id.* at 146–47).

**BAR Robbery**

Several witnesses testified that payroll for the four establishments managed by Curcio, including Nikita's, was left in envelopes with the on-duty bartender at BAR for pickup on Tuesdays between 6:00 p.m. and 8:00 p.m. (Tr. 3/6/2019 at 73–74, 123–24; Tr. 3/8/2019 at 174–75, 181, 169, 201, 217). Pariseau testified that she would normally wait for payroll to arrive and then leave afterwards. (Tr. 3/8/2019 at 175–76). She further explained that she normally drove to work, and Chambers was familiar with her vehicle. (*Id.* at 176).

Reginald Woodard worked as a bartender at BAR and knew Chambers. (*Id.* at 217–18). Woodard testified that the Saturday before the robbery, on November 11, 2017, Chambers came to BAR. (*Id.* at 218–19). Woodard recalled that Chambers sat at the corner of the bar in a position where he had full view of the area behind the bar. (*Id.* at 219–21). Woodard explained that Chambers normally would not talk much with him when he came to BAR, but that Saturday, Chambers stayed longer and was more talkative than usual. (*Id.* at 218–19, 221–23). Their conversation was mostly "street-oriented," but Chambers did talk about the Nikita's robbery. (*Id.* at 223). In light of the events that followed, Woodard testified that he found the encounter with Chambers to be suspicious and drew a connection between it and the subsequent robbery. (*Id.* at 222–23).

On the night of the BAR robbery (Tuesday, November 14, 2017), Woodard was the on-duty bartender. (*Id.* at 180, 223). Pariseau was at BAR waiting for payroll to arrive, but her vehicle was not in the parking lot because it was being repaired. (*Id.* at 179–80). External video surveillance footage shows Chambers's vehicle pulling into a parking lot across from the rear parking lot for the Lovell building, where BAR was located, shortly before the robbery. (Gov't

Ex. 56-C).  For almost a minute, the vehicle idled near the exit, facing the Lovell parking lot.[5] (*Id.*).  The vehicle then drove into the Lovell parking lot, after which Brown exited the vehicle. (Gov't Ex. 56-D).  Brown initially walked toward the rear door of BAR before walking back, and the Government posited at trial that he had discovered that the back door to BAR was locked.  (*Id.*; Gov't Ex. 56-E).

Shortly thereafter, Brown entered BAR through the front entrance while holding a cell phone to his ear.  (Gov't Ex. 56-F).  Brown pulled out a firearm as he approached Woodard and Pariseau, who were at the bar.  (*Id.*).  Woodard testified that it looked like Brown was talking to someone on the phone, but he could not make out what was being said.  (Tr. 3/8/2019 at 224–25). When Brown approached, he told them that he was "not playing," and Pariseau told Woodard to do whatever Brown asked.  (*Id.* at 181–83).  Brown moved behind the bar with Woodard while still brandishing his firearm and holding the cell phone to his ear.  (Gov't Ex. 56-F).  When Woodard moved to open the cash register for Brown, Brown directed Woodard to move away from the register and picked up a basket underneath it instead.  (*Id.*; Tr. 3/8/2019 at 183–84).  Pariseau testified that payroll was delivered in a stack of envelopes, which was normally kept near the register.  (Tr. 3/8/2019 at 202).  But, on the night of the robbery, payroll had not arrived yet, and the basket that Brown took was full of office supplies, including envelopes.  (*Id.* at 181, 203).

As Brown picked up the basket, he put down his cell phone from his ear for the first time. (Gov't Ex. 56-F).  As Brown moved out from behind the bar with the basket, he passed Woodard and shot him.  (*Id.*).  In response Woodard ran out of the front door while Brown ran out of the back door.  (Tr. 3/8/2019 at 184–85, 231–32; Gov't Ex. 56-D; Gov't Ex. 56-E).  After confirming that the robber had left, Pariseau grabbed her cell phone and went to look for Woodard.  (Tr.

---

[5] The Government asked the jury to infer that Chambers was checking to see if Pariseau's vehicle was present, which, if it were not, would normally mean that the payroll had been delivered to BAR.

3/8/2019 at 185–86).  As she left BAR, she called 911.  (*Id.* at 186).  The parties stipulated that Pariseau called 911 at 6:58 p.m. (Gov't Ex. 127).  Pariseau eventually found Woodard, who had collapsed in the parking lot.  (Tr. 3/8/2019 at 186).

Later that night, at 12:38 a.m., Chambers sent the following text message to Pariseau: "Just got back in town sonebody [sic] said someone got shot in bar is you okay what happened[.]" (Gov't Ex. 55-B).  Pariseau thought it was suspicious that Chambers's message led with "just got back in town" because, although many people reached out after the robbery, nobody else mentioned where they were at or what they were doing during the robbery.  (Tr. 3/8/2019 at 192).  Pariseau also testified that she had previously been romantically involved with Chambers but had broken off the relationship.  (*Id.* at 213).  Accordingly, at the time of the robbery, Pariseau testified that she and Chambers were not speaking frequently, (*id.* at 209), which was corroborated by other evidence that Pariseau was largely non-responsive to Chambers's efforts to communicate with her in the weeks leading up to the BAR robbery.  (Def.'s Ex. 518).

Investigators later seized Brown's two cell phones.  A review of the call log from one of those phones and Chambers's cell phone records revealed that Brown called Chambers at 6:54 p.m. the night of the BAR robbery and remained on the phone with him until 6:56 p.m.  (Gov't Ex. 83 at 5; Gov't Ex. 99 at 30; *see also* Tr. 3/8/2019 at 104–05).  The extraction reports for both of Brown's cell phones do not reveal any calls with anyone other than Chambers on the day of the BAR robbery.  (Gov't Exs. 83, 84).

SA Wines testified about the general location of Chambers's cell phone on the night of the BAR robbery.  SA Wines testified that Chambers's cell phone was not active outside of the Bridgeport or Stratford area that day.  (Tr. 3/14/2019 at 152).  SA Wines further opined that if someone were to make a call from BAR, he would expect the cell phone to use either Sector 2 or

Sector 3 of Tower 610. (*Id.* at 150–51). SA Wines testified that Chambers's cell phone used Tower 610, Sector 3, twice on November 14, 2019—once to receive an incoming call at 6:54 p.m. and once to make an outgoing call at 6:59 p.m. (*Id.* at 150). Both parties attempted to elicit an opinion concerning the significance of the second call terminating at 7:00 p.m. on Tower 721. During his testimony, SA Wines was generally reluctant to determine movement based on a change in cell sites when the call was of short duration. (*See id.* at 173–75). But he agreed that a phone might use Tower 721 if the caller was driving south on Interstate 95 or in the area of the on-ramp to Interstate 95 that was located about "1,200 feet from the area of BAR-Stratford." (*Id.* at 155, 182, 200).

**EbLens Robbery**

On the morning of November 16, 2017, Ateelah Boyd and Kyana Smith ("K. Smith") arrived for work at EbLens, a shoe and apparel store, in Bridgeport. (Tr. 3/12/2019, ECF No. 215, at 119–21, 135–36). Boyd was working near the cash register, while K. Smith was in the backroom handling a shipment and paperwork. (*Id.* at 122, 136–37). They opened the store to the public at 9:27 a.m. (Gov't Ex. 67-B).

Around 9:24 a.m., Chambers parked on Chestnut Street, a side street near the shopping center where EbLens is located, even though it was raining and the shopping center has a parking lot. (Gov't Ex. 65-F; Tr. 3/14/2019 at 21–22, 24; Tr. 3/12/2019 at 162; Gov't Ex. 79). After parking, Chambers walked to EbLens while Brown waited in the running vehicle. (Gov't Ex. 65-F). Chambers entered EbLens at 9:28 a.m. (Gov't Ex. 67-B). Surveillance footage shows Chambers walking around the store and speaking with someone out of view of the camera. (Gov't Ex. 67-C). K. Smith, who did not have an independent recollection of this encounter, testified while reviewing the surveillance footage that Chambers could have been talking to either her or

Boyd based on his location in the store. (Tr. 3/12/2019 at 147, 152–53). Surveillance footage shows Chambers looking back and forth between the direction of Boyd and K. Smith during this exchange. (Gov't Ex. 67-C). Chambers exited the store at 9:29 a.m. without purchasing anything. (Gov't Ex. 67-D; Tr. 3/12/2019 at 147).

Chambers's cell phone records reveal that less than a minute after leaving EbLens, he placed a call to Brown, which lasted for 23 seconds. (Gov't Ex. 99 at 35). Surveillance footage shows Brown exiting Chambers's vehicle at 9:30 a.m. (Gov't Ex. 65-F). At 9:31 a.m., Chambers received an incoming call from Brown, which lasted 13 seconds. (Gov't Ex. 99 at 35). Surveillance footage shows Chambers returning to his vehicle at 9:32 a.m., where he waited. (Gov't Ex. 65-F).

At 9:35 a.m., Brown entered EbLens while wearing a mask and hooded sweatshirt with the hood up. (Gov't Ex. 67-E). After approaching Boyd at the register, Brown pulled out a firearm and pointed it at her and led her into the back room where K. Smith was. (Gov't Ex. 67-F; Gov't Ex. 67-G). Upon seeing the robbery in progress, K. Smith was able to call 911 before Brown and Boyd arrived. (Tr. 3/12/2019 at 148–50; Gov't Ex. 67-H). K. Smith then led Brown to the safe and put the money in a bag for him. (Tr. 3/12/2019 at 150–51). After taking the money, Brown exited the store at 9:37 a.m. (Gov't Ex. 67-H; Gov't Ex. 67-I).

Officer Juan Esquilin testified that he was working near EbLens the morning of the robbery, overseeing utility pole work. (Tr. 3/12/2019 at 161–62). Shortly after hearing a radio dispatch for an armed robbery at EbLens, Officer Esquilin saw Brown exit EbLens and pursued him as he ran back to Chestnut Street. (*Id.* at 163–69; Gov't Ex. 65-F). Surveillance footage and testimonial evidence established that Brown managed to open the front passenger door of Chambers's vehicle, but he shut the door and fled when he saw Officer Esquilin in close pursuit.

10

(Tr. 3/12/2019 at 169–70; Gov't Ex. 65-F).  Shortly thereafter, law enforcement apprehended Brown.  (Tr. 3/12/2019 at 177–78).

      While Brown was in custody at the scene, Officer Dave Neary testified that he saw Brown moving around in the patrol car in a manner that made him concerned that Brown might have another weapon on his person other than the already seized firearm.  (*Id.* at 226).  When Officer Neary opened the door, he found Brown attempting to talk to someone on his cell phone.  (*Id.*).  Officer Neary seized two cell phones from Brown.  (*Id.*).  The data extraction from one of Brown's cell phones revealed that he had dialed 203-526-2559*7.  (Tr. 3/14/2019 at 89–90).  The evidence also established that Chambers's cell phone number was 203-526-2559.  (Tr. 3/8/2019 at 179; Gov't Ex. 90; Gov't Ex. 91).  Mark Spinella, an analyst with the Federal Bureau of Investigations ("FBI"), testified that *72 is a code used by telephone companies for call forwarding.  (Tr. 3/14/2019 at 111–12).

      Officers subsequently seized Chambers's cell phone.  An analysis of the phone revealed that all of Chambers's 57 contacts with Brown between November 9, 2017 (the day of the Avenue Café robbery) and November 16, 2017 (the day of the EbLens robbery) had been deleted from the call log.  (Tr. 3/8/2019 at 120–21, 154; Tr. 3/14/2019 at 112).

      The Court denied Chambers's motions for judgment of acquittal and for new trial.  *United States v. Chambers*, No. 3:18-cr-79 (KAD), 2020 WL 734217 (D. Conn. Feb. 13, 2020).  Chambers's conviction was then affirmed on appeal.  *United States v. Chambers*, No. 21-1389, 2022 WL 6831645 (2d Cir. Oct. 12, 2022) (summary order).  In this Petition, Chambers asserts that he was denied effective assistance of counsel in violation of the Sixth Amendment.

**Discussion**

"Pursuant to § 2255, a federal prisoner may move to vacate, set aside, or correct his sentence [or conviction] on four grounds: (1) 'that the sentence was imposed in violation of the Constitution or laws of the United States, or (2) that the court was without jurisdiction to impose such sentence, or (3) that the sentence was in excess of the maximum authorized by law, or (4) is otherwise subject to collateral attack.'" *United States v. Hoskins*, 905 F.3d 97, 102 (2d Cir. 2018) (quoting 28 U.S.C. § 2255(a)) (brackets omitted).  These are "jurisdictional []or constitutional" issues that create "a fundamental defect which inherently results in a complete miscarriage of justice, []or an omission inconsistent with the rudimentary demands of fair procedure."  *See Hill v. United States*, 368 U.S. 424, 428 (1962).  A federal prisoner may also use § 2255 to attack his conviction because "[f]or the purposes of § 2255, the term 'sentence' refers to *both* the prisoner's sentence and underlying conviction." *Fermin v. United States*, 859 F. Supp. 2d 590, 596 (S.D.N.Y. 2012) (citing *Johnson v. United States*, 623 F.3d 41, 45 (2d Cir. 2010)) (emphasis in original).

Petitioner bears the burden of proving that a miscarriage of justice occurred.  *United States v. Hoskins*, 905 F.3d 97, 103 & n.6 (2d Cir. 2018); *see also Napoli v. United States*, 45 F.3d 680, 683 (2d Cir. 1995) ("The burden falls therefore falls upon petitioners to demonstrate their entitlement to relief under § 2255 . . . .").  In evaluating a petitioner's claim, "a district court need not assume the credibility of factual assertions . . . where the assertions are contradicted by the record in the underlying proceeding."  *Puglisi v. United States*, 586 F.3d 209, 214 (2d Cir. 2009) (collecting cases).  "Indeed . . . when the judge that tried the underlying proceedings also presides over the Section 2255 motion, a less-than full-fledged evidentiary hearing may permissibly dispose of claims where the credibility assessment would inevitably be adverse to the petitioner."  *Id.*

12

Second Circuit "precedent instructs that § 2255 review is 'narrowly limited in order to preserve the finality of criminal sentences and to effect the efficient allocation of judicial resources.'" *Hoskins*, 905 F.3d at 102 (quoting *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996)). The Second Circuit has summarized the principles governing the resolution of § 2255 claims as follows:

> [N]ot every asserted error of law can be raised on a § 2255 motion. . . . The grounds provided in [§] 2255 for collateral attack on a final judgment in a federal criminal case are narrowly limited, and it has long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment. As a general rule, relief is available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law that constitutes a fundamental defect which inherently results in a complete miscarriage of justice.

*Napoli v. United States*, 32 F.3d 31, 35 (2d. Cir. 1994) (internal quotation marks and citations omitted), *amended on reh'g on other grounds*, 45 F.3d 680 (2d Cir. 1995). Constitutional errors will not be corrected through a writ of habeas corpus unless they had a "substantial and injurious effect," that is, unless they resulted in "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637 (1993); *see also Underwood v. United States*, 166 F.3d 84, 87 (2d. Cir. 1999) (applying *Brecht* test to § 2255 petition).

Petitioner's § 2255 petition asserts a denial of rights guaranteed by the Sixth Amendment, which "provides certain procedural safeguards to individuals who have been charged with crimes, including the right to a speedy, impartial trial; the ability to call and confront witnesses; and, relevant here, 'the Assistance of Counsel.'" *United States v. Rosemond*, 958 F.3d 111, 119 (2d Cir. 2020) (quoting U.S. Const. amend. VI) (citation omitted). "Although the Sixth Amendment refers only to 'Assistance of Counsel,' it guarantees the right to *effective* assistance of counsel." *Id*. at 121 (citation omitted).

A petitioner making an ineffectiveness of counsel claim bears a heavy burden. "Ordinarily, to prevail on a claim for ineffective assistance of counsel a defendant must demonstrate that: (1) counsel's performance fell below an 'objective standard of reasonableness'; and (2) defendant was 'prejudice[d],' meaning that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Griffiths*, 750 F.3d 237, 242 (2d Cir. 2014) (quoting *Strickland v. Washington*, 466 U.S. 668, 693–94 (1984)).

"The *Strickland* standard is 'highly demanding,' and 'rigorous,'" and "must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." *Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011) (citations omitted). "Although a District Court must hold an evidentiary hearing when presented with any potentially meritorious claim under [§] 2255, a hearing is not required when, 'viewing the evidentiary proffers . . . and record in the light most favorable to the petitioner,' it is clear that the petitioner has failed to establish a 'plausible claim of ineffective assistance of counsel.'" *Lake v. United States*, 465 F. App'x 33, 34–35 (2d Cir. 2012) (summary order) (quoting *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009)).

**The Surveillance Video**

The Petition's first claim centers around surveillance video footage in connection with the EbLens robbery. The footage is taken from a nearby business and reveals Chambers's car parked along a street adjacent to EbLens. Chambers is seen exiting his vehicle, and he is subsequently caught on the EbLens security camera entering the store moments later. While Chambers is out of his vehicle, the surveillance footage reveals that the passenger, ultimately proven to be Brown, exits Chambers's vehicle. Moments later, Brown commits the robbery. In a memo to file prepared by one of Chambers's trial attorneys, defense counsel indicated that he did not fully appreciate the inculpatory nature of the surveillance video and did not appreciate that it showed Brown exiting

14

the vehicle moments before the EbLens robbery.  Pet., ECF No. 1, at 14–15.  Counsel said that he failed to review this portion of the surveillance footage with Chambers, and that "it is possible that this could have influenced [Chambers's] decision whether to accept a plea rather than proceed to trial."[6]  *Id.* at 15.  Counsel also noted that "[t]he defense received plea proposals dated January 3, 2019, and January 7, 2019, both of which were reviewed with Mr. Chambers.  Counsel at that time advised Mr. Chambers to plead guilty."  *Id.*

Chambers asserts that had he been advised about this video evidence, "this would have influenced Mr. Chambers['s] decision to accept a plea rather than proceed to trial."  *Id.* at 4.  The Government asserts that Chambers cannot meet the second *Strickland* prong of prejudice because the evidence presented by the Government as to the EbLens robbery is irrelevant to the plea offer that had been extended and rejected by Chambers.  Pet. Opp'n, ECF No. 12, at 5–6.

Where a defendant challenges the advice he received in connection with the plea bargaining process, he must demonstrate that "the outcome of the plea process would have been different with competent advice."  *Rodriguez v. United States*, 679 F. App'x 41, 42–43 (2d Cir. 2017) (summary order) (quoting *Lafler v. Cooper*, 566 U.S. 156 (2012)).

Here, the Government avers that on January 7, 2019, consistent with defense counsel's memo, a plea offer was extended which contemplated a guilty plea to Count 6, aiding and abetting the BAR Robbery—*i.e.*, the robbery during which Mr. Woodard was shot.  Pet. Opp'n, ECF No. 12, at 5.  Chambers rejected this plea offer no later than January 24, 2019.  *Id.*  The Court cannot identify any connection between this decision and the surveillance footage relating to the EbLens

---

[6] The basis for this assessment is certainly not obvious.  Whether or not counsel appreciated that Brown was in the car before the robbery, the surveillance footage from after the robbery minutes later was just as incriminating.  The footage shows Brown running from Officer Esquilin towards Chambers's waiting vehicle and attempting to enter Chambers's vehicle.  Brown quickly reverses course and closes the car door, and immediately thereafter, Chambers drives away from the scene.

robbery, and Chambers offers none.[7]  He summarily asserts that he would not have taken the case to trial, but he does not explain how the inculpatory nature of the evidence as it relates to the EbLens robbery would have persuaded him to plead guilty to the BAR robbery.  Indeed, the Government never offered a plea agreement that entailed the EbLens robbery alone.  *Id.* at 6 n.1. And Chambers cannot establish prejudice on the mere speculation that he would have been able to negotiate a plea deal that was different than the plea deal that was extended and rejected.  *See Suarez v. United States*, No. 13-CV-2981 (RJS), 2016 WL 3432464, at *5 (S.D.N.Y. June 16, 2016) (Sullivan, J.) ("Petitioner simply has not shown that a more favorable deal would have been offered by the government, and Petitioner's bald assertion that he was entitled to a better plea bargain is not a basis upon which habeas relief can be granted." (citing *Anthoulis v. New York*, 586 F. App'x 790, 792 (2d Cir. 2014)));  *see also Naranjo v. United States*, No. 17-CV-9573 (JSR) (BCM), 2021 WL 1063442, at *7 (S.D.N.Y. Feb. 26, 2021) ("Where a petitioner claims that he would have accepted 'a better deal' had his counsel only negotiated one, it is that petitioner's burden to show that the hypothetical plea would have materialized." (quotations omitted)).

Further, after January 24, 2019, the Government did not extend any further plea offer. Thus, at the time of trial, there was no plea agreement to accept or advice to be given regarding the same.  *See Lafler v. Cooper*, 566 U.S. 156, 168 (2012) (noting that in the absence of a plea offer or agreement, the issue of whether a defendant received ineffective assistance of counsel does not arise).  And absent such a plea offer from the Government, Chambers's only option would have been to plead guilty to each of the six charges then pending.  Chambers nowhere alleges that he would have pled guilty to all six charges had he reviewed the video surveillance footage relating

---

[7] Indeed, in response to the Government's opposition raising this argument, Chambers does not explain in his reply (beyond asking the Court to speculate) how his knowledge about the EbLens surveillance footage would have impacted his decision on the plea offer that was actually on the table, when the footage had no connection to the plea offer.

to the EbLens robbery with his lawyers.  To the contrary, Chambers asserts in his reply that "if not for counsel's deficient performance," he would have "taken the plea offer or at least understood the plea offer and what he was really facing."  Pet. Reply, ECF No. 13.  But as discussed above, the footage had no bearing on the offer that was actually made—a plea to the BAR Robbery.  It is also significant that Chambers was acquitted of two of the six charged robberies.  As such, a plea to all six counts (his only option once he rejected the plea offer) would have resulted in a Guidelines range well above the sentence he eventually received.[8]  In such a circumstance, no hearing is required because no prejudice can be demonstrated.  *See Colotti v. United States*, No. 11-CV-1402 (DLC), 2011 WL 6778475, at *16 (S.D.N.Y. Dec. 21, 2011) (denying that hearing is necessary where petitioner made a "naked claim without any discussion" that he would have pled guilty to the entire indictment if he had received different advice).

Finally, the Government argues that whether his counsel was aware of the surveillance footage or not, Chambers himself knew that Brown was a passenger in his car shortly before the robbery and knew that his vehicle had, in fact, been caught on surveillance video.  Thus, the Government posits, had Chambers simply told his counsel that Brown was in the vehicle, counsel could have made an assessment of the case and advised Chambers accordingly.  At the very least, it may well have caused counsel to spend more time with the surveillance videos.  The Court agrees with the Government.  Indeed, it seems patently unfair to blame counsel for not figuring something out from a video when Chambers himself knew precisely what his counsel had failed to appreciate.  *See Tyson v. Keane*, 159 F.3d 732, 736 (2d Cir. 1998).  In *Tyson*, the habeas petitioner challenged his counsel's trial strategy regarding a tape-recorded call between a rape victim and her assailant.

---

[8] The Government, based upon Chambers's pre-sentence report (PSR), calculates the resulting guideline range to be 292 to 365 months.  This calculation assumes two additional "groups," as well as a reduction for Acceptance of Responsibility had Chambers pled guilty.  Chambers does not challenge this calculation, and the Court agrees that it accurately reflects what the hypothetical PSR would have concluded.

The defense contended that it was not the defendant on the tape. The defense had sought appointment of a voice expert, but the request had been denied. In his petition, the defendant argued that had he been appointed the expert, the expert would have identified defendant as the speaker, and the defense strategy would then have been different. *See id.* The Second Circuit rejected this argument because the defendant himself knew it was his voice on the tape, and had he simply told his lawyer as much, the defense strategy would have been adjusted accordingly.[9] *See id.* The same is true here. Chambers knew he had driven Brown to the EbLens robbery yet elected not to tell his lawyers as much. So, in this vein, Chambers is himself the architect of his counsel's purported deficient performance. This is especially so when counsel's advice (which was not taken) was to plead guilty.

### Cognitive Deficiencies

Chambers next asserts that he suffers from cognitive disabilities which his lawyers failed to appreciate, and which resulted in his lawyers failing to adequately explain the plea offer to him. Chambers fails to offer anything other than his own opinion in this regard,[10] and in any event, this claim is largely belied by the record.

The Court first observes that Chambers's *pro se* Petition and his Reply are both well-written, cohesive, and articulate. His written submissions contain absolutely no indicia of any cognitive impairments, let alone the severe impairment he espouses. Further, Chambers had three lawyers who interacted with him over the course of a 14-day trial, none of whom raised any

---

[9] "First, the expert's report and the jury's verdict establish that it was Tyson's voice on the tape. Tyson certainly knew that and remembered the conversation, which took place shortly after the rape. If Tyson had simply informed counsel before trial of that fact there would have been a reassessment of the defense. The principal reason why the 'wrong' defense strategy was pursued at trial was not the trial judge's error but Tyson's own conduct, whether characterized charitably as lack of candor or as a lie." *Tyson*, 159 F.3d at 736.

[10] Chambers indicates in his Petition that his appellate counsel would supply the evidence in support of this claim. No such submission was received.

concern regarding his intellectual abilities: Chambers was vigorously engaged with his lawyers throughout the trial; Chambers denied any mental or emotional health issues in connection with the preparation of his Presentence Investigation Report[11]; the U.S. Probation Officer did not note or observe any apparent cognitive impairments; the evidence at trial allowed for the reasonable inference (and as argued by the Government) that Chambers was the planner behind the robbery spree; Chambers's conduct in the course of the robberies evinced a sophisticated plan to avoid detection; and Chambers's work history demonstrated that he was not, as claimed, functionally illiterate or severely cognitively impaired.  Indeed, Chambers graduated high school; briefly attended Job Corps; had adult relationships; fathered four children; and was otherwise, save for the robbery spree, a functioning member of adult society.

Although at sentencing, with new counsel, Chambers submitted an evaluation that concluded that Chambers did indeed suffer from several cognitive impairments and that he had a full-scale IQ that placed him in the bottom 3% of the adult population, *see* Suppl. Sentencing Mem., Dkt. No. 3:18-CR-79 (KAD), ECF No. 331, at 3, the evaluation was, for the reasons outlined above, not entirely credited.  *See* Sentencing Tr., Dkt. No. 3:18-CR-79 (KAD), ECF No. 349, at 64–66.  The Court's observations at sentencing have equal application here.  In short, Chambers has not established that his lawyers failed to explain the proposed plea agreement in a fashion he could understand in light of his purported cognitive limitations.

---

[11] Chambers advised that he had been diagnosed with ADHD as a child and that he stopped taking medication for same after 6 months because he did not feel he needed it.  PSR, Dkt. No. 3:18-CR-79 (KAD), ECF No. 316, ¶ 114.

**The Amended Petition**

On August 7, 2025, Chambers filed an Amended Petition[12] in which he seeks to raise an issue based upon the Supreme Court's decision in *United States v. Taylor*, 596 U.S. 845 (2022), in which the Court held that attempted Hobbs Act robbery is not a crime of violence for purposes of 18 U.S.C. §924(c).  Am. Pet., ECF No. 17.  Chambers asserts that he was convicted of "multiple counts of attempted Hobbs Act robbery" and that he "may have received enhancements under the sentencing guidelines based on activity he was not convicted of."  *Id.* at 1.

First, Chambers was convicted of *aiding and abetting* three separate successful Hobbs Act robberies, not *attempted* Hobbs Act robberies.  Only Count 6 charged aiding and abetting an *attempted* Hobbs Act robbery.  Notwithstanding, *Taylor* is inapposite.  Simply put, Chambers was not charged with a § 924(c) violation, so whether attempted Hobbs Act robbery is a "crime of violence" thereunder had no bearing on Chambers's sentencing.  Nor did Chambers receive any "enhancements" under the guidelines for conduct of which he was not actually convicted.

Chambers was convicted on four of six charged armed Hobbs Act robberies.  He was charged as an aider and abettor of each.  The BAR robbery was an attempted Hobbs Act robbery because the payroll cash had not yet been delivered to the restaurant at the time of the robbery.  The robberies could not be "grouped" under the Guidelines so each was assigned its own offense level, which was calculated based upon an individualized assessment of each robbery.  Nothing in *Taylor*'s holding would alter Chambers's Guidelines calculation.

**Juvenile Adjudications**

In the Amended Petition, Chambers also posits that, contrary to U.S.S.G. section 5H1.1, he "received multiple enhancements that increased his sentence for crimes/convictions he

---

[12] The filing is identified as a "Motion to Amend/Supplement Petitioner's 2255." ECF No. 17.  However, the Court addresses it as an Amended Petition or supplement to his original Petition.

committed/sustained as a youthful offender." Am. Pet., ECF No. 17, at 2. He therefore seeks a re-sentencing, presumably as an alternative to vacating his conviction and sentence. Chambers conflates the policy statement regarding a downward departure based upon a defendant's age, with the Guidelines, which govern calculation of a defendant's criminal history category. But in any event, he is wrong.

First, Chambers was 34 years old at the time of the robberies, rendering section 5H1.1 wholly inapplicable to his case. *See, e.g.*, *United States v. Parrot*, No. 21-CR-691 (RMB), 2025 WL 995398, at *1 (S.D.N.Y. Apr. 3, 2025) ("Parrot was 37 years old when he committed the instant offense which was more than a decade past being a 'youthful individual' as described in Section 5H1.1." (internal quotations and alteration omitted)). Second, although Chambers's Juvenile Adjudications were included in the PSR, Dkt. No. 3:18-CR-79 (KAD), ECF No. 316, ¶¶ 84–85, they were not scored any points, and so, they did not impact his criminal history category calculation. *Id.* Finally, a review of the PSR reveals that each criminal conviction that was included in the Guidelines calculation occurred on the adult criminal docket. *Id.* ¶¶ 86–94. There is no indication of "youthful offender" convictions or adjudications. *Id.* Chambers had amassed 14 criminal history points by the time of the instant conviction. Accordingly, he was properly determined to have a Criminal History Category of VI. *Id.* ¶ 95.

**Conclusion**

For all of the foregoing reasons, the Petition for Writ of Habeas Corpus (ECF No. 1) is

DENIED.  No evidentiary hearing is necessary.  The Amended Petition (ECF No. 17) is also

DENIED.  The Clerk of the Court is directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 6th day of October, 2025.


 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE